UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 10-CV-22124-HUCK/MCALILEY

Great Florida Bank,

    Plaintiff,

v.

Countrywide Home Loans, Inc.,

    Defendant.
_____/

## ORDER ON MOTION TO DISMISS AND MOTION TO STRIKE

In the aftermath of the worst mortgage crisis in recent history, market participants have scrambled to ascertain how such devastation could have occurred and account for their own losses. Plaintiff Great Florida Bank is no exception. It contends that Defendant Countrywide Home Loans, Inc. fraudulently induced it to purchase a pool of mortgage loans of poorer quality than was represented. The matter is presently before the Court on Countrywide's Motion to Dismiss (D.E. # 28) and Motion to Strike Improper Allegation of the Amended Complaint (D.E. # 29). For the following reasons, the Motion to Dismiss is granted in part and denied in part, and the Motion to Strike is denied.

### Facts

For purposes of the Motion to Dismiss, the facts as alleged in the operative Second Amended Complaint (D.E. # 38) are assumed to be true. In April 2006, Great Florida was interested in purchasing a pool of residential mortgage loans. In this regard, Great Florida engaged in numerous discussions with Countrywide, during which Great Florida indicated that it wished to purchase, and Countrywide represented it would sell, "non-conforming" loans. A loan is considered non-conforming if it is not eligible for sale to government-sponsored entities (such as Fannie Mae). That a loan is non-conforming does not mean that it was not properly underwritten; it may in fact meet some set of reasonable underwriting guidelines, just not those of a government-sponsored entity. Countrywide further represented that the loans were "full doc"—underwritten

1

based on substantial and reputable documentary evidence of the borrowers' income. Thus, while non-conforming, the loans were represented and anticipated to be of relatively high quality.

These discussions proved fruitful, and Great Florida purchased from Countrywide, pursuant to the May 31, 2006 Mortgage Loan Purchase and Servicing Agreement, what Great Florida believed to be such non-conforming loans. The Purchase Agreement and subsequent Trade and Purchase Confirmations repeated a number of the pre-contractual representations regarding loan type and quality, including that the loans were non-conforming and largely full-doc. The Purchase Agreement also contained, as Great Florida's sole remedy, a "substitute and repurchase" provision permitting Great Florida to demand that Countrywide substitute or repurchase any loans whose value was materially and adversely affected by a breach.

Subsequently, the housing market took a turn for the worse. By the end of 2007, having observed a large increase in loan delinquencies, Great Florida conducted a review of the documentation provided by Countrywide and discovered significant problems with the loans. According to Great Florida, the review "demonstrate[d] that Countrywide intentionally misrepresented to Great Florida that the loans were primarily non-conforming, full doc loans, when in fact they were primarily [of much poorer quality and documentation]." Great Florida describes, by way of example, numerous instances in which Countrywide loans, after being rejected for purchase by government-sponsored entities due to defects that would also render them unqualified for non-conforming status, were intentionally re-designated by Countrywide as non-conforming and then offered for sale to Great Florida. Great Florida also alleges that "the majority of the loan files provided by Countrywide . . . lack any underwriting guidelines or approvals."

Great Florida asserts causes of action for (1) fraudulent inducement, (2) breach of contract with respect to underwriting representations and warranties, (3) breach of contract with respect to loan servicing, and (4) contractual indemnification of attorneys' fees.

The Second Amended Complaint also calls attention to recent actions against Countrywide's parent and the parent's executives in which the Securities and Exchange

Commission, the State of California and private plaintiffs have alleged fraud and recklessness in connection with loan origination and underwriting practices.

## Analysis

**A. Motion to Dismiss**

### 1. Fraudulent Inducement[1]

Individually, each of the legal issues posed by the fraudulent inducement claim in this case—the Economic Loss Rule, the merger clause's disclaimer of reliance, and the *Lone Star* principle—is confounding due to the unsettled nature of the applicable law, and would be difficult to apply dispositively.  Courts have engendered confusion by ruling on these issues while giving short analytic shrift to—if even recognizing—the conflicting views of other courts.  However, as discussed below, regardless of the ultimate outcome of each of these disputed issues, what may or may not be achievable individually becomes necessary in the aggregate.  That is, on the particular facts and circumstances of this case, the cumulative weight of these issues requires dismissal of the fraudulent inducement claim.

i. The Economic Loss Rule

Countrywide first contends that Great Florida's claim for fraudulent inducement is barred by Florida's Economic Loss Rule.  The question is starkly posed: is a claim for fraudulent inducement viable where, as here, the alleged misrepresentations on which the action is predicated were incorporated into a subsequent contract?  The matter is fraught with conflict and uncertainty.  *See* Paul J. Schwiep, *Fraudulent Inducement Claims Should Always Be Immune From Economic Loss Rule Attack*, 75 FLA. B. J. 22 (April 2001) (tracing the problem's complex and confusing history, describing various competing approaches courts have taken, and suggesting reform).

Stated generally, the Economic Loss Rule is "a prohibition against tort actions to recover solely economic damages for those in contractual privity." *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 536 (Fla. 2004).  Underlying the Economic Loss Rule is a policy of respecting the parties' own ordering of their relationship.  Parties to an agreement have chosen to be governed by contract law and to distribute their

---

[1] The parties agree that Florida law governs the fraudulent inducement claim, and that California law governs the breach of contract claims.

3

benefits, burdens and losses pursuant to agreement.  Parties are even permitted, without fear of punitive damage, to breach agreements when they deem it "efficient" to do so.  Thus, courts are understandably reluctant to superimpose the often inapposite strictures of tort law upon contractual duties, even where they may otherwise permissibly overlap.  As one commentator put it, the Economic Loss Rule "defines the boundary between the overlapping theories of tort law and contract law by barring the recovery of purely economic loss in tort."  R. Joseph Barton, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 WM. & MARY L. REV. 1789, 1789 (2000).

There is, however, an exception to the Economic Loss Rule permitting an action in tort despite the existence of a contractual relationship and the fact that the damages are purely economic "when the breach of contract is attended by some additional conduct which amounts to an independent tort."  *Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.*, 482 So. 2d 518, 519 (Fla. 3d DCA 1986).  The Florida Supreme Court has recognized that fraudulent inducement is an example of such an independent tort.  *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996); *see Indem. Ins. Co. of N. Am.*, 891 So. 2d at 542 (referring to "those situations in which this Court ha[s] permitted recovery for purely economic loss, such as in the context of fraudulent inducement and negligent misrepresentation").

The Florida Supreme Court has never squarely addressed the issue at hand, namely, whether the Economic Loss Rule bars a claim for fraudulent inducement where the predicate misrepresentation is repeated within the parties' subsequent contract.  That it has yet to address the issue is hardly surprising, because the typical Economic Loss Rule case involves pre-contractual misrepresentations that are not repeated in, and are often contrary to, the contract.  In the absence of an explicit and binding pronouncement on the issue, two views have emerged.

Under one view, the fact that a pre-contractual misrepresentation is later included within the contract has no bearing on the application of the independent tort exception to the Economic Loss Rule.  That is, so long as there is fraud in the inducement, the Economic Loss Rule's independent tort exception applies, and the fraud action may be maintained.  This view is premised on a number of grounds.

4

First, while it might have initially appeared that fraudulent inducement is not an "independent tort" unless the subject misrepresentation is different—*independent*—of the misrepresentation contained in the contract, that is not the way the Florida Supreme Court has defined independence. Florida Supreme Court decisions suggest, but don't explicitly hold, that what makes a tort independent from a breach of contract is that a separate element—here, intent—is required to establish the tort, not that the pre-contractual misrepresentations be different than those giving rise to a breach of contract. *HTP, Ltd.*, 685 So. 2d at 1239 ("Fraudulent inducement is an independent tort in that it requires proof of facts separate and distinct from the breach of contract."); *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1223 n.4 (Fla. 2010) ("[T]he economic loss rules would not prevent the bringing of an action and recovery for intentional torts, such as, fraud . . . and other torts requiring proof of intent."). A number of courts have explicitly held what the Florida Supreme Court has only indirectly suggested, adding their own plausible policy considerations to the mix. Exemplary is the Fifth District Court of Appeal's reluctance to preclude an action for fraudulent inducement in similar circumstances:

> The fact that the measure of damages may be the same for both causes of action does not make the fraud claim disappear. It is no more desirable to have tort law drown in a sea of contract than to have contract law drown in a sea of tort. The notion that a knowing fraud perpetrated to induce someone to enter into a contract can be extinguished by the simple expedience of including the fraudulent representation in the contract makes no sense.

*La Pesca Grande Charters, Inc. v. Moran*, 704 So. 2d 710, 712 (Fla. 5th DCA 1998). *See Nationwide Advantage Mortgage Co. v. Fed. Guar. Mortgage Co.*, No. 09-CV-20372, 2010 WL 2652496 (S.D. Fla. Feb. 26, 2010) (recognizing viability of claim for fraudulent inducement even though misrepresentations were also contained within contract); *Allen v. Stephan Co.*, 784 So. 2d 456, 458 (Fla. 4th DCA 2000) (same); *see also Luigino's Int'l, Inc. v. Miller*, 311 Fed. Appx. 289, 2009 WL 330861 (11th Cir. Feb. 11, 2009) (unpublished decision) (noting that the Economic Loss Rule would not apply to bar a fraudulent inducement claim based on a misrepresentation regarding ownership of property despite the fact that the misrepresentation was expressly set forth in the agreement, as the contract, when made, was incapable of performance).

Second, a number of cases, though they do not involve or reference the Economic Loss Rule, contemplate the viability of a fraudulent inducement claim even when the predicate misrepresentation—in these cases, the then-known-to-be-false promise to perform—is also contained within the subsequent contract, as must necessarily be the case when the misrepresentation itself is the promise to perform. In *Steak House, Inc. v. Barnett*, the Florida Supreme Court held:

> Where at the time of the execution of a contract the party promising to perform an act in the future has a secret undisclosed intent not to carry it out but fraudulently represents that he will perform as an inducement to the other party to enter into the contract, this fraud is ground for rescission in equity, whether the act to be performed constituted the entire consideration or not.

65 So. 2d 736, 738 (Fla. 1953); *see also Royal v. Parado*, 462 So. 2d 849, 855 (Fla. 1st DCA 1985) (invoking this rule to maintain an action for fraudulent inducement).

An opposing view, however, has also developed. This view distinguishes between fraudulent conduct collateral to the subsequent contract and conduct "inseparably embodied" in the contract. Under this view, the Economic Loss Rule would preclude pre-contractual misrepresentations later inseparably embodied in the contract from forming the basis of a claim for fraudulent inducement. *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74, 77 (Fla. 3d DCA 1997) ("A critical distinction must be made where the alleged misrepresentations are inseparably embodied in the parties' subsequent agreement."). "[S]ince [the *HTP* decision was issued], courts have found that statements or misrepresentations made to induce an individual to enter a contract, if later contained within the terms of the actual contract, cannot constitute a basis on which to bring the fraud claim." *Ben-Yishay v. Mastercraft Dev., LLC*, 553 F. Supp. 2d 1360, 1370 (S.D. Fla. 2008) (internal quotations omitted); *Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1366 (S.D. Fla. 2003). This opposing view possesses substantial practical appeal, particularly where the actual damages resulting from the alleged misrepresentations are purely economic and identical to those suffered on account of the contractual breach.

Choosing between these competing and not unreasonable views is a difficult task, and one can only hope that the Florida Supreme Court soon has occasion to clarify this issue, which—as with much of Economic Loss Rule jurisprudence—is mired in

6

controversy. *See Indem. Ins. Co. of N. Am.*, 891 So. 2d at 544 (Cantero, J., concurring) ("The economic loss rule has become a confusing morass . . . stated with ease but applied with great difficulty." (quotations omitted)); *Moransais v. Heathman*, 744 So. 2d 973, 980 (Fla. 1999) ("We must acknowledge that our pronouncements on the rule have not always been clear and, accordingly, have been the subject of legitimate criticism and commentary.").

ii. Reliance and the Merger Clause

Countrywide next contends that Great Florida has not alleged reasonable reliance sufficient to state a claim for fraudulent inducement. Under the Purchase Agreement, Great Florida had the right to conduct a loan-by-loan review of each mortgage loan it intended to purchase. According to Countrywide, "[b]lack-letter law demonstrates" that Great Florida cannot establish justifiable reliance on the misrepresentations because "it did nothing to challenge them despite having every right to undertake the examinations that would reveal their claimed falsity." Great Florida responds that it did not undertake an extensive examination based on the allegedly fraudulent assurances of Countrywide and that, even if it had desired to do so, Countrywide took some four years to provide the required documentation. Given these competing claims, the Court cannot dispose of this aspect of reliance on a motion to dismiss. *See Maloul v. Berkowitz*, No. 07 Civ. 8525, 2008 WL 2876532, at *2 (S.D.N.Y. July 23, 2008) (noting that element of reasonable reliance "is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss").

Countrywide further contends that the Purchase Agreement's merger clause precludes the claim for fraudulent inducement. In relevant part, the merger clause states that the Purchase Agreement "constitute[s] the entire understanding between the parties with respect to each mortgage loan package and supersede[s] all prior or contemporaneous oral or written communications regarding same." Countrywide argues that regardless of the Economic Loss Rule, the pre-contractual misrepresentations cannot give rise to an action for fraud—which requires reliance—because the merger clause evinces Great Florida's lack of reliance on any pre-contractual representations. Again, there is disagreement among courts. *Compare Natarajan v. Paul Revere Life Ins. Co.*, --- F. Supp. 2d ----, 2010 WL 2509886, *7 (M.D. Fla. June 18, 2010) ("[A] merger clause

7

will not categorically preclude the consideration of extraneous evidence of fraud in the inducement, except where the statements alleging fraudulent inducement are explicitly contradictory to a specific and unambiguous provision of the contract."); *Noack v. Blue Cross and Blue Shield of Fla., Inc.*, 742 So. 2d 433, 434 (Fla. 1st DCA 1999) ("Neither is the presence of a merger clause an impediment to a cause of action for fraud in the inducement."); *with Topp, Inc. v. Uniden Am. Corp.*, 513 F. Supp. 2d 1345, 1348 (S.D. Fla. 2007) ("Furthermore, when alleged misrepresentations are discussed and incorporated into a written contract containing a merger clause that supercedes [sic] all prior representations and agreements, the economic loss rule bars recovery for fraudulent inducement.").

iii. *Lone Star*

Finally, Countrywide contends that the Purchase Agreement's repurchase provision—which permits Great Florida to demand that Countrywide repurchase any loans whose value is materially and adversely affected by a breach—renders the misrepresentations inactionable. Countrywide cites *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010) (applying Texas and federal securities law), in support of its argument that since the Purchase Agreement expressly contemplates that Great Florida "might receive loans that differ from what [Countrywide] promises," and provides a substitution or repurchase remedy for breach, no action for fraud may be maintained.

In *Lone Star*, the defendant sold to plaintiff some $60 million of mortgage-backed securities whose prospectuses included representations and warranties guarantying the quality of the underlying mortgage pool, which contained more than 10,000 residential mortgages. As it turned out, slightly less than 1,000 of the loans were delinquent when the securities were sold to the plaintiff. The Fifth Circuit, reading the representations and warranties together with remedial provisions similar to those here at issue, concluded that "the 'repurchase or substitute' clauses change[d] the nature of" the seller's representation. Instead of a representation that the underlying mortgage pool was free of delinquency, the Fifth Circuit construed a different representation: "that the mortgages should be non-delinquent, but if some mortgages were delinquent then [defendant] would either repurchase them or substitute performing mortgages." *Id.* at 389.

8

Under *Loan Star*'s reasoning, an exclusive remedial provision contained within a contract—one which offers a full economic cure of the damage caused by potential misrepresentation—should ordinarily be given effect. The rationale is quite similar to one of the purposes of the Economic Loss Rule, namely, "to prevent parties to a contract from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort." *Indem. Ins. Co. of N. Am.*, 891 So. 2d at 536. This purpose, however, is generally not offended in instances of fraud, because "[w]here the agreed-to allocation of economic risks was the result of fraudulent misrepresentations, it cannot be said that the contractual allocation of economic losses was fully and fairly assented-to by the defrauded party." *Nationwide*, 2010 WL 2652496 at *5 n.11. Countrywide argues that *Nationwide*'s principle isn't implicated here because Great Florida has not been deprived of a fair allocation of risk; the Purchase Agreement's repurchase or substitute remedial provision ensures that the risk remains with Countrywide. There is, not surprisingly, a counterargument: Great Florida likely anticipated (and accepted), as did the plaintiff in *Lone Star*, that performance would not be perfect (namely, that there would be some errors), which is why it negotiated a remedial provision. This possibility was not—and in transactions of such complexity usually is not—a significant impediment to contract. However, if Great Florida had known that performance would be substantially non-compliant, it might not have entered into the contract. It might have viewed the task of availing itself of the remedial procedures, and attendant costs and delays, to be neither profitable nor worth the trouble. According to the counterargument, then, the remedial provision cannot be thought to make Great Florida whole in a situation in which, as alleged, fraud pervades the transaction and causes a substantial failure of performance. Great Florida is essentially arguing, not implausibly, for an exception to the *Lone Star* principle where pervasive fraud prevents a party from getting the benefit of its bargain under the agreement's remedial provision.

iv. The Whole is Greater than the Sum of its Parts

This is not, at least doctrinally, a typical case presenting a single potential impediment to an action for fraud. Were it so, the Court would be compelled to choose among the competing views on the application of that single impediment. Here, however, it is the confluence of three potential impediments that, in the Court's view,

compels dismissal. Sophisticated parties, with the opportunity to conduct due diligence, entered into an agreement expressly disclaiming consideration of or reliance on pre-contractual representations, providing a remedial provision requiring the repurchase or substitution of defective loans and permitting recovery against the breaching party for all losses, including reasonable and necessary legal fees and costs.  Under these circumstances, it would be improper, impractical, unnecessary, and contrary to the spirit and purpose of the Economic Loss Rule to enter the realm of tort.  Accordingly, the count for fraudulent inducement must be dismissed.

### 2. Contractual Claims

Countrywide contends that the causes of action sounding in contract are not ripe for adjudication, as such causes have not accrued under the terms of the Purchase Agreement, which provides that

> Any cause of action against Countrywide relating to or arising out of the breach of any representations and warranties . . . shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Purchaser or notice thereof by Countrywide to the Purchaser, (ii) failure by Countrywide to cure such breach or repurchase such Mortgage Loan as specified above, and (iii) demand upon Countrywide by the Purchaser for compliance with the relevant provisions of this Agreement.

Countrywide disputes the sufficiency of Great Florida's demand.  Great Florida responds that the matter of sufficiency of demand is not addressed by the Purchase Agreement, and that Great Florida's bare assertion that it has in fact complied with its obligations under the Purchase Agreement's "accrual" provision is sufficient to satisfy federal pleading standards.  For better or worse, the pleading standards for conditions precedent to suit are quite lax, and are here satisfied.  *See* Fed. R. Civ. P. 9(c) ("In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed."); *Probado Techs. Corp. v. Smartnet, Inc.*, No. C-09-349, 2010 WL 2232831, *7 (S.D. Tex. June 2, 2010) ("[R]equiring plaintiff to plead 'specific allegations' that all conditions are met is not required under the Federal Rules").  Of course, the parties should be mindful that the failure to comply with conditions precedent to suit may ultimately result in dismissal and the imposition of sanctions.  *See Ro-Ro Enters., Inc. v. State Farm Fire and Cas. Co.*, No. 93-1754-CIV, 1996 WL 556928, *3 (S.D. Fla. Sept. 5, 1996).

10

**B. Motion to Strike**

Countrywide asks that the Court strike from the Second Amended Complaint paragraphs thirty-one through forty-two, which call attention to recent actions against Countrywide's parent and the parent's executives in which the Securities and Exchange Commission, the State of California, and private plaintiffs have alleged fraud and recklessness in connection with loan origination and underwriting practices. Countrywide argues that these paragraphs are unrelated to this controversy and may confuse the trier of fact or cause other unspecified prejudice. The Court notes that the mere presence of this material within the Second Amended Complaint does not entail its relevance, admissibility into evidence, or even its further consideration. Finding no prejudice, and generally disfavoring such motions, the Court denies the requested relief.

## Conclusion

For the foregoing reasons, it is hereby ordered that the Motion to Strike is denied. It is further ordered that the Motion to Dismiss is granted insofar as the count alleging fraudulent inducement is dismissed with leave to amend, and denied in all other respects.

DONE and ORDERED in Chambers, Miami, Florida, October 13, 2010.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
Counsel of Record